UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* PHILIP BERGERON,<br><br>      Plaintiffs,<br><br>  v.<br><br>INSOURCE DIAGNOSTICS<br>CORPORATION and SYNTACTX, LLC,<br><br>      Defendants. | No.<br><br>**FILED IN CAMERA AND UNDER SEAL**<br><br>JURY TRIAL DEMANDED |

## ORIGINAL COMPLAINT

On behalf of the United States of America ("United States") and himself, Relator Philip Bergeron ("Relator") files this Complaint against Defendants InSource Diagnostics Corporation ("InSource") and Syntactx, LLC ("Syntactx") (collectively "Defendants"), and alleges as follows:

**I. INTRODUCTION**

1. This is a civil action to recover damages and penalties on behalf of the United States arising from false claims and statements made and presented by the Defendants and/or their agents and employees in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*.

2. The FCA allows an individual, known as a relator or whistleblower, to file an action

on behalf of the government for violations of the FCA and receive a percentage of the government's recovery. 31 U.S.C. § 3730. Under the FCA, the Complaint must be filed under seal (without service on the defendants) to enable the government to conduct its own investigation without the defendants" knowledge and to allow the government an opportunity to intervene in the action.

3. The violations alleged herein involve the payment of kickbacks and submission of false claims for laboratory testing services to the Medicare Program. It is estimated that Defendants' fraud has cost the Medicare Program thousands of dollars in improper payments and is ongoing. If left unchecked, Defendants' fraudulent scheme will result in more than $10 million in illegal reimbursement from the Medicare Program.

## II. JURISDICTION AND VENUE

4. Relator brings this action on behalf of himself and the United States pursuant to 31 U.S.C. § 3730(b)(1).

5. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331 and 1345 because the claims arise under federal law.

6. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, reside in, and/or have transacted business in the United States.

7. Venue is proper in this District under 28 U.S.C. § 1391(b)-(c), and 31 U.S.C. § 3732(a) because one or more Defendant(s) can be found and transact business within this District and alleged violations occurred in this District.

## III. DEFENDANTS

8. Defendant InSource is a California corporation with its principal place of business

located 231 W. Chestnut Avenue, Monrovia, California, 91016. InSource is certified by the Centers for Medicare and Medicaid ("CMS") as an independent diagnostic laboratory under the Clinical Laboratory Improvement Amendments of 1988 ("CLIA") and its National Provider Identifier ("NPI") number is 1023354040.

9. Defendant Syntactx is a New York limited liability company with its principal place of business located at 4 World Trade Center, 150 Greenwich Street, 44th Floor, New York, New York 10007. Syntactx is a contract research organization that assists laboratories and other medical device manufacturers in designing and implementing clinical trials.

### IV. THE RELATOR

10. Relator Philip Bergeron is an owner of a Rhode Island company that assists physicians with participating in and administering clinical trials.

11. Relator's company regularly participates in registered, privately funded clinical research. He has extensive experience in conducting and administering clinical trials.

12. As defined in 31 U.S.C. § 3730(e)(4)(B), Relator qualifies as the "original source" of the allegations made herein. Specifically, the violations alleged herein are based upon Relator's personal knowledge, expertise, and non-public documents made available to Relator during the course of his communications with Defendants. Relator provided the information that forms the basis of the allegations made herein to the federal government prior to filing this Complaint.

### V. REGULATORY FRAMEWORK

#### A. Medicare Coverage of Laboratory Testing

13. Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*., establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program ("Medicare"). Medicare is available to individuals over the age of 65 and individuals

under the age of 65 with certain diseases. Generally, Medicare coverage is available to beneficiaries for services that are considered to be reasonable and necessary under § 1862(a)(1)(A) of the Social Security Act. Medicare does not cover services that are considered investigational or have no proven clinical benefit. The Medicare Program is separated in four different parts: Medicare Parts A, B, C, and D. Medicare Part B covers clinical laboratory testing services for enrolled beneficiaries.

14. The Medicare Program is overseen by CMS, which is an agency within the United States Department of Health and Human Services.

15. Investigational items and services are generally not eligible for Medicare coverage. However, Medicare will cover the routine services and items associated with care provided in connection with a qualifying clinical trial if the routine services would have otherwise qualified for coverage—*i.e.,* the claims would have been eligible for reimbursement outside of the clinical trial.

16. Beginning with claims submitted in January 2014, all Medicare claims for services or items provided in connection with a clinical trial must contain the National Institutes of Health's online registry, [www.clinicaltrials.gov](www.clinicaltrials.gov) ("clinicaltrials.gov") identifier number on the claim. Prior to January 2014, inclusion of this identifier was encouraged-but-optional.

17. After a physician prescribes a clinical laboratory test for a Medicare Part B beneficiary, the laboratory to whom the test is referred will generally submit a claim directly to the Medicare Administrative Contractor under the laboratory's NPI number.

### B. The Anti-Kickback Statute

18. Pursuant to the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), it is unlawful to knowingly offer or pay any remuneration in exchange for the referral of any service (including laboratory testing) for which payment is sought from any federally funded health care program,

4

including Medicare, Medicaid, and TRICARE.

19.  The Anti-Kickback Statute prohibits healthcare providers, such as clinical laboratories, from compensating a referring physician when one purpose of the payment is to induce or reward referrals.

20.  A violation of the Anti-Kickback Statute is a violation of the False Claims Act. In other words, Medicare coverage is conditioned upon providers' compliance with the Anti-Kickback Statute and Medicare claims generated through or tainted by an illegal kickback arrangement are materially false.

21.  Healthcare providers that submit claims to Medicare in connection with a qualifying clinical trial must comply with the Anti-Kickback Statute.

22.  The Anti-Kickback Statute contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C. § 1320a-7b(b)(3). None of the statutory exceptions or regulatory safe harbors protects Defendants from liability for the conduct alleged herein.

       **C.**    **The Stark Law**

23.  The Stark Law, 42 U.S.C. §1395nn, *et seq.*, prohibits a provider, such as a clinical laboratory, from paying remuneration to physicians for referring Medicare patients to the provider for certain "designated health services" ("DHS"), such as laboratory services, where the referring physician has a nonexempt "financial relationship" with the DHS provider. 42 U.S.C. § 1395nn(a)(1), (h)(6). The Stark Law provides that the DHS provider shall not cause to be presented a Medicare claim for such items or services. The Stark Law also prohibits payment of claims for services rendered in violation of its provisions. 42 U.S.C. § 1395nn(a)(I), (g).

24.  Clinical laboratory services are designated health services as defined in Section

5

1877(h)(6) of the Social Security Act and 42 C.F.R. § 411.351.

25. A claim submitted to Medicare in violation of the Stark Law is a violation of the False Claims Act by both the referring physician and DHS provider. In other words, Medicare coverage is conditioned upon providers' compliance with the Stark law and Medicare claims generated during a period of disallowance as defined in the Stark Law regulations are materially false. *See* 42 C.F.R. § 411.353(c) (defining the "period of disallowance").

26. Healthcare providers that submit claims to Medicare in connection with a qualifying clinical trial must still comply with the Stark Law, 42 U.S.C. § 1395nn, *et seq*. and 42 C.F.R. §411.350, *et seq*.

### VI. ALLEGED MISCONDUCT

27. Defendants are the creators of a clinical trial called the "Standard of Care Versus Urine Testing With Selective Pharmacogenomics for Effective Drug and Dosing REgimines: SPHERE" (the "SPHERE Trial"). The SPHERE Trial was registered in November 2015 on the National Institutes of Health's online registry, clinicaltrials.gov, under clinical trial identifier NCT02625155.

28. Defendants have advertised the SPHERE Trial as a study to determine the clinical benefit of pharmacogenomics testing. Pharmacogenomics testing refers to a type laboratory test performed on a patient to identify genetic variations in the patient's Cytochrome 450 gene family. Variations in these genes can affect the rate at which patients metabolize certain drugs. The SPHERE Trial purports to measure clinical benefit in terms of the incidence of adverse drug reactions participants experience in the 90-day period following enrollment in the SPHERE Trial.

29. Unfortunately, the primary purpose of the SPHERE Trial is not to generate useful scientific data. Rather, it is the latest in a series of kickback schemes implemented by clinical

laboratories with the assistance of Defendant Syntactx. The *modus operandi* of Syntactx's kickback schemes are to use clinical studies as a front for paying illegal compensation to physicians to induce referrals for laboratory testing claims that are billed to Medicare Part B.

30. Defendant Syntactx has assisted multiple laboratories in creating kickback schemes that have cost the Medicare program over $150 million in fraudulent reimbursement.

31. In 2013, Syntactx helped design and register two clinical trials with the New Orleans laboratory UTC Laboratories LLC (doing business as Renaissance Rx) ("Renaissance") that also purported to study the clinical benefits of pharmacogenomics testing.

32. First, Syntactx and Renaissance created the Diagnosing Adverse Drug Reactions Registry ("DART") Trial, which was registered on clinicaltrials.gov on October 22, 2013 and purported to create a registry of 250,000 patients to study the occurrence of adverse drug events within 60 days of pharmacogenomics testing. The genetic testing, performed by Renaissance, was billed to Medicare and participating physicians were compensated $75 for every patient they enrolled in the study in violation of the Stark Law and Anti-Kickback Statute.

33. Second, Syntactx and Renaissance registered the Urine Toxicology with Pharmacogenomic Interpretation Assay ("UTOPIA") Trial with the clinicaltrials.gov website on March 21, 2014. The UTOPIA Trial purported to establish a registry of 200,000 patients to study the quantitative effect of differences in the Cytochrome 450 gene family on urine toxicology testing results. Physicians were again paid compensation for every patient they enrolled in the UTOPIA Trial and both the pharmacogenomics testing and urine toxicology testing was provided by Renaissance and billed to Medicare. Representatives employed by Renaissance and Syntactx specifically targeted Medicare beneficiaries for enrollment in the DART and UTOPIA Trials.

34. The DART and UTOPIA Trial schemes resulted in more than *$150 million in*

*illegal reimbursement* being paid to Renaissance in 2013 and 2014 before CMS suspended payments in early 2015. Incredibly, this is after Renaissance was paid only $153,528 by Medicare in 2012, before the start of the DART and UTOPIA Trial kickback schemes.

35. Syntactx went on to implement remarkably similar kickback schemes with other small clinical laboratories that established clinical trials as a front for paying physicians to induce Medicare Part B laboratory testing prescriptions. In March 2014, Syntactx collaborated with General Genetics Corporation to establish the Pharmacogenomic Testing of the Elderly to Reduce Morbidity ("POETRY") Trial. The POETRY Trial purported to establish a registry of 280,000 patients to study the clinical benefit of pharmacogenomics testing on elderly patients, *i.e.,* Medicare beneficiaries. Again, physicians were paid a fixed fee for every Medicare patient they enrolled and ordered testing for in violation of the Stark Law and Anti-Kickback Statute.

36. Syntactx helped design and implement yet another clinical trial scheme with another small clinical laboratory, Companion Dx Reference Lab, LLC. This trial was registered on clinicaltrials.gov in March 2014 as the Utility of Pharmacogenomics for Reducing Adverse Drug Effects ("UPGRADE") Trial and purported to establish a registry of 279,000 patients to study whether pharmacogenomics testing can reduce adverse drug events in the 90 days after patients are enrolled in the study. Like Syntactx's other trials, the UPGRADE Trial paid a fee to physicians for every patient they enrolled and the testing claims were billed to Medicare by the laboratory. Syntactx was primarily responsible for designing and implementing these trials, which resulted in millions of dollars in false claims to Medicare for laboratory testing services.

37. On June 25, 2014, the Office of the Inspector General for the Department of Health and Human Services ("OIG") issued a Special Fraud Alert regarding payments by laboratories to referring physicians. Special Fraud Alert: Laboratory Payments to Referring Physicians, *available*

*at* https://oig.hhs.gov/fraud/docs/alertsandbulletins/2014/OIG_SFA_Laboratory_Payments_06252014.pdf. The Special Fraud Alert specifically noted that OIG had become aware of registries and clinical trials established by or affiliated with laboratories that were being used to pay illegal compensating to physicians for enrolling patients and ordering testing services. The Special Fraud Alert identified some characteristics of an illegal arrangement. These included registries that paid physicians on a per-patient basis, registries where the laboratory exclusively performed the testing, and registries that encouraged the physician to order a panel of tests when the entire panel was not medically necessary.

38. The regulations promulgated by CMS under the Stark Law also make clear that any financial arrangement between a laboratory and referring physicians that compensates the physician based upon, or varying with, the value or volume of referrals or other business generated between the parties is illegal.

39. Due in part to the large amount of Medicare fraud and lack of clinical benefit associated with pharmacogenomics testing, CMS stopped or severely limited payment for pharmacogenomics testing claims in early 2015.

40. The SPHERE Trial is the latest attempt by Syntactx and a clinical laboratory, this time Defendant InSource, to pay illegal compensation to physicians for laboratory testing referrals. Since CMS has cutoff payment for pharmacogenomic testing, however, the SPHERE Trial was designed by Defendants to generate urine toxicology testing claims that are billed to Medicare Part B by Insource.

41. Defendants registered the SPHERE Trial on clinicaltrails.gov on November 25, 2015, as is required for every clinical study conducted in the United States.

42. Defendant InSource is the sponsor of the SPHERE Trial and Syntactx is listed as a

collaborator for the SPHERE Trial.

43. The SPHERE Trial indicated that every patient enrolled in the study would receive comprehensive urine drug testing as part of the protocol. The information submitted by Defendants indicate that the anticipated size of the SPHERE Trial is 14,000 patients recruited from multiple sites across the United States.

44. One of those sites is the physician practice of Donald H. Deaton, D.O. located in Tazewell, Tennessee. Defendants list the physician practice of Donald H. Deaton, D.O. as a participating site that is currently recruiting participants for the SPHERE Trial.

45. Defendants have also created a promotional website for the SPHERE Trial, www.insourcedex.com. Per the website, the SPHERE Trial purports to validate biomarkers in urine that predict genetic mutations, which affect a patient's ability to properly metabolize medications, namely opioids, benzodiazepines, tricyclic antidepressants and muscle relaxants, including hydrocodone and oxycodone (the "Target Drugs").

46. The website indicates that InSource is recruiting 14,000 subjects in up to 200 research sites from physicians, including pain management, family practice, internal medicine, psychiatry, addiction, and/or rheumatology who actively prescribe the Target Drugs for duration longer than 90 days.

47. The website also indicates that physicians will receive a $50 payment for every patient enrolled in the SPHERE Trial. The website claims this payment is fair market value compensation that was determined by a third-party appraisal.

48. The $50 per-patient payment violates the Stark Law and Anti-Kickback Statute even if it does not exceed fair market value because it is paid on a per-patient basis, closely correlates with the volume and value of orders for urine drug testing that are referred to Insource

and billed to Medicare, and one purpose of the payment is to induce referrals for services billed to Medicare. *See* 42 C.F.R. § 1001.952(d); 42 C.F.R. §411.357(d)(1)(v) and §411.357.

49. On or around August 30, 2016, Eric Kwak, the Chief Business Officer for InSource spoke with Relator regarding the SPHERE Trial. During the phone call, Kwak asked Relator questions regarding the number of Medicare patients Relator would be able to enroll in the SPHERE Trial because Medicare covers the urine drug testing claims whereas some private insurance would not. Kwak also stated that other sites were already up and running, indicating that InSource had submitted claims to Medicare in connection with the SPHERE Trial and had paid the referring physicians the per-patient enrollment fee.

50. On or around August 30, 2016, Kwak also emailed Relator documents that included a "New Client Registration" form, "Custom Panel Request Urine" form, a non-disclosure agreement for sites in the SPHERE Trial, and clinical trial site questionnaire. The New Client Registration form indicates it is for the SPHERE Trial and lists the author of the form as Eric Kwak. The Custom Panel Request Urine form was also created by Eric Kwak. The SPHERE Trial questionnaire document indicates it was created by Syntactx, specifically, by Elizabeth Ouriel. Ouriel is a project manager at Syntactx, whose primary focus has been "the emerging pharmacogenomics arena," according Syntactx's website, in July 2015. The SPHERE Trial non-disclosure agreement also indicated it was created by Ouriel and last modified in July 2015.

51. Based upon the existence of a financial arrangement that violates the Stark Law, every single Medicare claim for laboratory services sent to InSource by a physician participating in the SPHERE Trail is a false claim that is not eligible for Medicare reimbursement. Under the Stark Law, the period of disallowance starts when the financial relationship is formed and does not end until the physician returns the improper compensation.

52. On information and belief, InSource, with the assistance of Syntactx, began submitting false claims to Medicare in connection with the SPHERE Trial in mid-2015 and the fraud is ongoing.

53. Defendants knowingly submitted or caused to be submitted false claims to Medicare Part B for laboratory testing services that were referred to InSource by the physicians participating in the SPHERE Trial. Syntactx was well aware that this financial arrangement violated the Stark Law and Anti-kickback Statute because the June 2014 Special Fraud Alert expressly indicated this type of arrangement was illegal and because its past clinical trials resulted in payment suspensions by CMS and are the subject of ongoing governmental investigations. Insource was also aware that one purpose of the SPHERE Trial was to compensate physicians for making referrals for laboratory services that would be paid for by Medicare. Simple arithmetic indicates that the 14,000 patient study size would generate millions of dollars in Medicare reimbursement and approximately $700,000 in illegal compensation to the participating physicians.

## COUNT I:   PRESENTATION OF FALSE CLAIMS UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3729 (a)(1))

54. Relator re-alleges and incorporates by reference the allegations contained paragraphs 1 through 53 as if fully stated in this Count.

55. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 (a)(1), as amended.

56. By virtue of the acts described above, Defendants knowingly or acting with deliberate ignorance or with reckless disregard for the truth, presented or caused to be presented to the United States Government false or fraudulent claims for government funding under Medicare.

57. Such claims were false or fraudulent because the Defendants knowingly presented, or caused to be presented, claims for clinical laboratory service to the Medicare program that were not eligible for reimbursement.

58. The United States, unaware of the falsity of the claims made by the Defendants, paid Defendants for claims that would otherwise not have been allowed.

59. By knowingly failing to comply with requirements upon which payment was contingent, each claim presented by Defendants was false.

60. By knowingly, willfully or recklessly presenting, or causing other to present, false claims for payment to the United States, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), to the damage of the treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendant has engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

61. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims that it would not otherwise have paid.

62. Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims plus statutory penalties for every false claim submitted or caused to be submitted by Defendants.

### COUNT II:   FALSE RECORD OR STATEMENT UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3729 (a)(1)(B))

63. Relator re-alleges and incorporates by reference the allegations contained

paragraphs 1 through 53 as if fully stated in this Count.

64. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 (a)(1)(B), as amended.

65. By virtue of the acts described above, Defendants knowingly or acting with deliberate ignorance or with reckless disregard for the truth, made, used, and caused to be made and used, false records and statements that were material and resulted in the improper payment of federal funding.

66. The United States, unaware of the falsity of the records and statements, made payments for claims that would otherwise not have been allowed.

67. By knowingly, willfully or recklessly making, or causing others to make false statements and certifications material to the United States' decision to pay on false claims, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), to the damage of the treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

68. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly false claims that it would not otherwise have paid.

69. Damages to the United States include, but are not limited to, three times the full value of improper payments resulting from the false statements plus statutory penalties for every false statement made or caused to be made by Defendants.

## COUNT III:  FAILURE TO RETURN OVERPAYMENTS UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(G))

70. Relator re-alleges and incorporates by reference the allegations contained paragraphs 1 through 53 as if fully stated in this Count.

71. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 (a)(1)(G), as amended.

72. By virtue of the acts described above, Defendants have knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the federal government.

73. Once known, even if the improper payments were not fixed or clearly defined, Defendants had an obligation under Section 1128J(d) of the Social Security Act to remit or report such funds to the Government within sixty days. Defendants have not reported or returned the improper payments described herein.

74. Defendants knew or should have known, at least 60 days prior receipt of payment for the earliest false claims identified herein, that the payments they received from Medicare for laboratory testing services were improper and gave rise to an obligation to return those payments to the federal government.

75. By knowingly concealing and/or knowingly and improperly avoiding its obligation to transmit money recovered to the federal government, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G) and caused the United States to be deprived of funds that rightfully belong to the government.

76. Damages to the United States include, but are not limited to, three times the full value of the overpayments resulting plus statutory penalties for every known overpayment that Defendants failed to return to the United States.

### COUNT IV:   CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT (31 U.S.C. § 3729 (a)(1)(C))

77. Relator re-alleges and incorporates by reference the allegations contained paragraphs 1 through 53 as if fully stated in this Count.

78. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 (a)(1)(C), as amended.

79. By virtue of the acts described above, Defendants have knowingly conspired to violate 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G).

80. Specifically, Syntactx and InSource agreed that Syntactx would assist InSource in creating and implementing a clinical trial that was used to pay illegal remuneration to physicians to induce referrals for laboratory testing services that were billed to Medicare in violation of the Stark Law and Anti-Kickback Statute. Substantial steps were taken by Defendants in furtherance of this scheme including creating and registering the SPHERE Trial, recruiting and paying referring physicians, and submitting false claims to Medicare.

81. Defendants acted knowingly, recklessly, or with deliberate indifference in agreeing to and implementing a scheme to illegally obtain and retain Medicare payments in violation of 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G).

82. The United States, unaware of the falsity of the records and statements, paid Defendant for claims that would otherwise not have been allowed as a result of the actions taken by Defendants in furtherance of conspiracy that violates U.S.C. § 3729 (a)(1)(C).

83. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly false claims that it would not otherwise have paid.

84. Defendants are jointly and severally liable for every violation of the False Claims Act identified herein because these violations were committed in furtherance of a scheme to violate the False Claims Act, which was undertaken with the mutual agreement of each Defendant who each had knowledge of the scheme's illegality.

85. Damages to the United States include, but are not limited to, three times the full value of the resulting false claims or overpayments plus statutory penalties for every violation resulting from Defendants' conspiracy.

WHEREFORE, Relator requests that judgment be entered against Defendants, ordering that:

a. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*;

b. Defendants pay the maximum statutory penalties for every violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions;

c. Relator is awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d. Relator is awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

e. Defendants are enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

  f. Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

  g. Defendants pay prejudgment interest on all damages and disgorgements to maximum extent provided under federal law; and

  h. The United States and Relator recover such other relief as the Court deems just and proper.

**JURY DEMAND**

A trial by jury is hereby demanded.

Dated: October 21, 2016.

                LEVY KONIGSBERG LLP

          By: _____
                 Alan J. Konigsberg (AJK/6373)
                 *akongisberg@levylaw.com*
                 Brendan E. Little (BL/8220)
                 *blittle@levylaw.com*
                 800 Third Ave., 11th Floor
                 New York, NY 10022
                 Phone: (212) 605-6200
                 Fax: (212) 605-6290

                 *Attorneys for the Relator*